We're here this afternoon for the case of Honolulutraffic Commission v. Federal Transit Administration and Faith Action for Community Equity. Counsel. May it please the Court. I'm Nicholas Yost representing the appellants, and I'm joined here by Matthew Adams and Jessica Duggan. And I will, if I may, reserve three minutes of my argument for rebuttal. This case is the very paradigm of how not to do 4F or NEPA. Step back and look at the bottom line of what's happening here. We're dealing with a project which is going to move people over a 20-mile corridor along the Honolulu waterfront. The environmental impact statement comes out considering only three alternatives, all of which are heavy rail, all of which have the same termini, which are essentially identical except for minor routing differences. This violates both NEPA and Section 4F. These statutes are very different. 4F is a mandatory statute. It is a substantive statute. The Supreme Court made abundantly clear in Overton Park what it was that 4F was saying. The agency must choose an alternative which avoids historic or park resources if there is a feasible or prudent alternative. And the Supreme Court in Overton Park, and this remains the only Supreme Court case dealing with 4F, says that the historic values are to be given paramount importance. By what standard do we review the agency's determination that no other alternative is feasible and prudent? Well, the arbitrary and capricious standard is there, however, constrained by the direction which particularly in the 4F case where the Congress has given direction as to how to balance, as the 2008 regulations from the agency itself say, these are not, quote, an equal-footing kind of balancing. It is a from-on-the-scale kind of approach. And they use the words it must the alternative must substantially outweigh the other alternatives. The district court did remand on, with respect to a couple of these, three of these sites, did it not? The district court remanded, but only on, quite frankly, subsidiary questions. The larger issue of, you know, the alternatives which have been addressing,  I think they are. Are you talking now about the 4F or are you talking about NEPA? Well, I'm talking in the case of the district court in the 4F context in which they My question, I guess, is where did the district court go wrong in his analysis? The district court, you know, with all due respect to an exceptionally fine court, the court got sort of caught up in the trees instead of looking at the forest. It didn't look at the larger issue. It deferred excessively to the agencies. And it misapplied the law by not applying the 2008 regulations, despite the fact that those regulations were brought to the attention of the agency, which obviously should have known about them. But it was brought to the attention of the agencies by Honolulu traffic in its 2009 comment letter. The district court then went on to borrow from the National Historic Preservation Act an ability to phase a project to defer certain parts of analysis on a phased basis. And this court had, in the North Idaho case, previously said you just can't do that. That was error. Well, didn't the court have a reason for that? I thought the court rejected the notion that you should – that you have to dig up all of the root in order to do what you wanted it to do. Well, the agency's own advisory committee, the task force which they created, said that the AISs, the archaeological studies, should be done prior to the work being undertaken. The agency's own documents rate the probability of finding human remains, native Hawaiian remains, in the area – three easternmost areas to be built as high. And with a situation like that, to go on with a high probability of finding something where your own advisors have said you've got to study it first is, you know, is error. Well, I thought that the – I thought what was contemplated was to look where they knew that the pillars were going to go and not dig up the entire length of the root. Am I incorrect in that? I think that's a fair statement. Yeah. Nobody – That makes sense. Yes, yes. Nobody claims that the entire root should be dug up, but those places where they're going to be doing something are supposed to be dug up in advance of making a decision instead of after the decision. But that – That sort of leads to my question as to why we have appellate jurisdiction at this point when there are a lot of undecideds, including the possibility that there may be a whole new EIS. Well, for really sort of three reasons. One of them, under 1291, this is – there is a final adjudication of the issue dealing with the overall question, the basic question as to whether or not there should be a heavy rail system as distinguished from light rail or BRT or the managed lanes. That is decided – But don't our cases – before you leave that, don't our cases say it only qualifies under 1291 when there's a remand to the agency and the agency is not contesting the remand, when a holding of non-appealability would effectively deprive the litigants of an opportunity to obtain review? I'm quoting from Alsia Valley, but there's plenty of other cases that say that. How does the remand effectively deprive you of an opportunity to obtain review? As I understand it, after the remand, the agency will do whatever it does. If you don't like it, you can appeal that to the district court, and then we can take up the whole matter with all the issues decided. So explain for me how you lose the opportunity to obtain appellate review. That is an excellent question. Thanks. I worked on it hard. And, I mean, the answer is really is that the basic issue of whether you're going to have, at the end of the day, a heavy rail – whether committed to a heavy rail system, which this really assumes, or whether we're dealing with sort of details. I take your point on that. I take it your point is that whatever happens from now on is not going to lead us away from a heavy rail system. My question is why are you deprived of the opportunity in the future to have that decision reviewed simply because of the remand? Because they are going to go ahead and do construction with a heavy rail, and then no doubt we'll come in and say, oh, we've done so-and-so amount of heavy rail construction. Surely you don't want us to undo that. Then, secondly, I would point out that one of the factors to be looked at is the judge's intention. And Judge Toshima could not have been more clear that he said that this was a final appealable order. He designed it to be exactly that. Well, I have a question about that also, since I guess there's a request for a limited remand in this case on unrelated issues. Should we ask Judge Toshima whether he intended this to be a final appealable order? Well, Judge Toshima, frankly, could not have been more clear in what he said already. And he'll answer yes. Well, if he couldn't have been more clear, he'll answer yes. But I'm not sure he could have — I'm not sure that I discern his intent from this. That's why I asked. Didn't he say in the remand that — I think were the three issues — that they could undo the whole project, that maybe they would decide after that? I don't think there's much chance of that, I should say. But I think he specifically said that they — in the new EIS, they might determine to withdraw the EIS, withdraw the rod. And then he said when they do that, they could change the entire project. Well, Your Honor, we asked that they withdraw — that the judge ask that they withdraw the rod, and that the judge declined to do that. There is a final approval out there, and it's that final approval which we are contesting here. So is it your position that nothing that happens in the agency can affect the, you know, the basic issue you're complaining about, which is heavy rail along the route? That is accurate. I mean — So why are you pursuing the — are you pursuing the agency remand at all? Well, I mean, yes, but obviously just sort of to protect ourselves. Should unwisely, I think, this Court affirm the district court, then we would be back to the subsidiary issues of, all right, there's going to be a heavy rail. Where is it routed? Does it go through the Barataria? Should there be a tunnel? Blah, blah, blah, blah. And so we would try and recover what we can from that. But that would assume that a heavy rail system is there. And the basic thing before this Court, most respectfully, is are there, in NEPA's terms, reasonable alternatives, and in 4F terms, feasible and prudent alternatives? And it's frankly up to the agency to come up with them. But we've pursued three of those. We have pursued three of them actively. BRT, because this is the bus rapid transit system which the same agencies in 2002, 2003 had evaluated over the same corridor and said, this bus-oriented system, which involves new traffic lanes and new stations and so on, this is the best possible system. And then you have the letter from the city to District Judge Molloway in 2005, which says as a political decision, BRT is off the table. We're not going to consider it. Well, that's arbitrary and capricious not to consider something which you've already said, not even to consider it as an alternative when you've already said this is the best alternative out there in a full NEPA process concluding in an EIS. You know, I'm sure it's rather frustrating. This has been going on for so many years. And decisions made by a number of people. But I was, you know, I was surprised. I'll give you this example. I'll read you what Judge Tsushima said. Defendants were fully considered the prudence and feasibility. And this is just one of the three. All three were similar of the tunnel, et cetera. Should defendants determine upon further examination of the evidence that their previous decision to exclude the Baratania alternative because it would be imprudent was incorrect, they must withdraw the FEIS and ROD and reconsider the project in light of the feasibility of the Baratania tunnel alternative. Now, he used a similar language with respect to the other two. Now, how can that be a final decision that's irrevocable? That is limited, as are the others, to the Baratania tunnel, which assumes there is heavy rail. It's just a question of routing the heavy rail through the downtown. The far more basic questions to which BRT is a reasonable, prudent, and feasible alternative and to which the managed lanes alternative is also reasonable, prudent, and feasible. The managed lanes alternative was put forward by our client specifically to have something which had the advantages of rapid transit without impinging on historic resources. Exactly what 4F was calling for. Scalia. Is it your position that one through three sections are final and that the remanded issues will only affect section 4? That's correct. Yes. And there's an injunction as to that. Yes. So given that there's an injunction as to section 4, why do you suffer the inability to seek effective appellate review if we just wait until one through three are resolved? One through three have been resolved. My question is, given the existence of the injunction, which may be too narrow but is going to go back for further consideration, what irreparable harm does your side suffer by the case moving forward in the agency? Because one through three is going to be built. That's correct. Well, will they? But does that mean that there will be a heavy rail alternative? Yes. Why? Because you've built three-quarters of a heavy rail alternative. Pretty clear that the first quarter is going to be. That's my question, and I'm sorry for phrasing it so indistinctly. But is it then the law that the agency and the government and the city having proceeded in the face of a remand to the agency may then say, tough luck, we already did everything, we want to go ahead? Or aren't they stuck with the arguments about that would arise at the time the decision was made? In other words, I'm not sure I hear the other side saying, well, once we get this stuff up, we're going to say it's too late, you can't evaluate this on the merits. Do you think that's their position? In past experience, I would expect it to be their position. Well, you might expect it to be, but wouldn't that be an incorrect legal position? I mean, if after all they're asking us to defer decision until the agency processes this action, I'd be pretty skeptical of any argument they made later that since they improved their position while the agency was processing it, we ought not listen to the arguments you're making today. But may ask them that. But, I mean, there is a final decision out there as to three-quarters of the route which effectively, if this is, you know, if you're building heavy rails, you can't just switch to light rail or bus or something for the ‑‑ In Phase 4, the injunction deals only with the routing of Phase 4, doesn't it? That's correct. Yes. Yes. Not with the manner in which Phase 3. That's correct. You have it exactly, Your Honor. And then the third alternative, which is the one which is particularly the American Institute of Architects have put forward, and they said, look, they're almost all rapid transit being built in America today, and they're talking approximately 30 different projects, which some are completed, are light rail. How can you not consider light rail when that's there? Light rail, instead, just gets a brush off. And then there are various subsidiary issues. Our client on the managed lane ‑‑ I think we can give you about another minute and a half. Our client on the managed lane alternative submitted a letter which is in the record in 2009 commenting on the failure to follow the 2008 regulations, and there's no response for it ever. And as this court said in Center for Biological Diversity and the D.C. Circuit said more recently in Butte County v. Hogan, under NEPA, and you just cannot not reply to intelligent, thoughtful comment. With that, given your injunction, Your Honor, I will reserve any time I have left. Well, we'll give you a five-minute rebuttal. Thank you, Your Honor. May it please the Court. I am David Shilton. I'm representing the Federal appellees. I plan to take ten minutes and give five to the city defendants represented by Mr. Thornton. Also at council table is Mr. Meheula, who is the lawyer for the intervenors. He's not planning to take time, but if there are any questions directly for the intervenors, he can answer those. Mr. Shilton, before you begin, let me ask you the question. I tried to ask Mr. Yost, but maybe in a better fashion. There are some portions of this project that are not enjoined. There are some portions of the suit that are remanded to the agency for further determination. Are we going to end up in the situation Mr. Yost talks about, which is no matter how the agency decides on those other issues, the defendants are going to say, well, we've built so much of the route already that we can't go back? Well, I think the district court is pretty clear we've got to keep an open mind. But that's how it is. I understand what the district court said. I'm asking a practical question. Right. It's a question of appealability. If their ability to effectively seek appellate review of the district court's decision is foreclosed because events will progress in such a way that the district court really can't go back anymore, then I would be inclined to think this is a final appealable order. My question to you is, representing the defendants, are you going to forego that argument later down the road, or are you reserving the ability to say later down the road, well, in the meantime, we built so much of this that there is no reasonably prudent alternative? You know, I think that's an issue for the district court to decide in its equitable discretion whether there needs to be additional. Is your answer to my question yes, you're going to reserve the ability to make that argument? I can't say at this point that we'd rule any argument off the table in an equitable consideration, so it's possible we would, but it seems very unlikely, given that the remand is proceeding quickly, it's likely to be finished fairly soon, and they should be able to bring an appeal of all issues within a reasonable amount of time before there's any sort of commitment that would preclude other options. And why can't this wait until that, for that short period of time, and we can hear it all together? I think it could wait, and you could hear the whole package. You're saying on behalf of the government that this is only going to take 6 months and that nothing is going to be built in the meantime? That that is irreparable? Well, it's up to the city what to build. So you can't represent that?  We just provide the grant money. The government is here from the city that we will be hearing from. Right. But you can represent how quickly the process is likely to move through your agency. Well, I can represent that the draft supplemental environmental impact statement was sent out and that the public comment period ended on July 22nd. So that major part is done. Now the agency has to look at all of the comments and decide what it's going to do. I can't say exactly how much time that will take, but it's not one of those things that takes more than, you know, several months, I would think. And then the district court has said that the plaintiffs within 30 days of the final decision can bring objections to the district court. So it sounds like the district court plans to handle that expeditiously. And I would point out that the issues on the remand are intertwined with at least the 4F issues before this Court. There are issues about the meaning of feasible and prudent alternatives, issues about traditional cultural properties. While they're slightly different than the ones here, they are intertwined. And that seems to me one of the policy reasons behind this rule, that you've got to wait until the final judgment, until everything is tied up before you take it to the court of appeals. And, you know, I think this Court's decisions in Elsie and in similar cases indicate that. I think the problem is you could wait until it's all entirely up if your side wasn't going to start building the railroad or whatever you would call it. And, I mean, the more you do that, the less likely it is that that system can be torn down again. Well, that bureaucratic commitment sort of concern, I think, is one of the equities before the district court. And so if it is sent back, if the appeal is dismissed and it goes back to the district court, the plaintiffs are free to ask the district court if they think it's necessary for additional injunctive relief to address that bureaucratic commitment concern. And I can't say, you know, how we would respond, but the district court has been, you know, very amenable to arguments about injunctive relief. It did enjoin the fourth point, the fourth phase. Well, it didn't enjoin the rest of it. No. If we lack jurisdiction, then we lack jurisdiction. And it sounds like it's going to take a year before this matter could get up before us. And that doesn't – and yet the – and yet there is no injunction in the first three phases. There's nothing barring the first three phases as a matter of law. It's a matter of Federal law. There's a State bar, but yes. Okay. You're speaking only to Federal law. Right. But as a matter of State law, what is the status of the litigation? Well, the city defendants are complying with this Hawaii Supreme Court decision on doing the archaeological surveys of all four phases. And they have to get approval from the State Historic Preservation Division before that's done. So that process is also going on, but, you know, I don't know what the timing of that is, but right now that has everything basically enjoined. But I think, you know, this Court's rules about final judgments are what they are, and indicate that where it's possible to raise the – You're saying that nothing's going to happen now because of the State court action? Well, until there's – until that – there is compliance with that court's judgment. At that point, they can start on the first three phases. So as a matter of Hawaii law at the moment, given an order by the Hawaii courts, the first three phases are enjoined? The first – well, the project is not going forward on the first three. The first three phases. Technically, it was not an injunction. There was a declaratory judgment. Right. But in my – I guess I'm not – you can't tell me this, but I suppose you can because you've been required to do some things under Hawaii law, at least the defendants have. How far along are those – is compliance with the order of the Hawaii courts? I think Mr. Thornton would be a much better source on that. Sorry, I can't fully answer that. So – and also, I don't think there's an alternative basis for jurisdiction under 1292 because the plaintiffs did not challenge the injunction. If you challenge an injunction, yes, you can get review of any merits issues that are inextricably intertwined. So the injunction would be appealable, and if there weren't – if there weren't those two claims that had been in the injunction entered, the rest of it would be final. So it's rather odd. Well, you know, I think they could have challenged the injunction and said, you know, the district court abused its discretion by not enjoining the whole project, but they didn't. Is there any reason why if we were to say – if we were to say, well, it's not appealable, that they could – that the district court could enter a 54B judgment on the claim? You could remand it for – to ask the district court whether it would enter a 54B judgment, and then it would be a question of, you know, is there no just reason for delay, and the cases under that provision also look at the extent to which issues are intertwined. So that – I mean, that would be a possibility, would be to ask the district court about 54B, but that wasn't done in this case. I want to just comment on the two section 4. Because the district court did say that it was final. He did, yes. There's language in there about finality. On the two substantive 4F issues that were raised today, first with respect to the 4F regulations, the Department of Transportation 2008 regulations, the district court properly understood that these regulations were meant to codify the existing case law. And that case law, certainly in this circuit with the Alaska Center v. Armbrister case, plainly held that if the agency makes a determination that a particular alternative doesn't meet the purpose and need, then as long as that's not arbitrary and capricious, that's all the agency has to do. In that case, it was a rail alternative didn't meet the purpose and need of a road project. Here it's the flip side. It's that basically a road project, the managed lanes alternative, which would    It's not a private project, which is why we have to use buses and private cars and is not meet the purpose and need of this project. And I asked Mr. Yost how we reviewed the agency decision, but I'm interested in your view about how we reviewed Judge Tashima's decision. Judge Tashima could reverse the agency only if it was arbitrary and capricious, if you will. How do we review his decision? It's de novo review because it's summary judgment and you have the same record that he did. But I think he very carefully went through all of the arguments and had a great command of the record and appreciated, you know, what these regulations do and what they don't do. And these regulations simply embody that Alaska Center ruling. And if I may just point to the exact regulation, it's on page 118 of the addendum provided by the city defendants. It basically says an alternative is not feasible if it cannot be built as a matter of sound engineering judgment, and then says an alternative is not prudent if it compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need. And it doesn't require any additional analysis. What plaintiffs have pointed to is a provision in the preceding section, which is at sub 1, but that only applies where you have an avoidance alternative, that is like another route, which the agency finds has specific problems, like it's costly or it's disruptive to neighborhoods. In that case, the agency has to balance those problems against the historic value of the 4F property. It does not have to do that in the case where the problem is that the particular alternative just does not meet the purpose and need of the project. And that was the case here with the managed lane alternative because it doesn't provide this sort of high-capacity, fast transportation service, and it doesn't help the city's growth, smart growth policies, and it doesn't serve underserved communities. So that's why that regulation doesn't apply. The other point that was brought up with regard to Native Hawaiian burials, the district court here did a very thorough job of pointing out how much had been done by way of analyzing the existing information on archeological resources in the area. And that the test for deciding whether that's enough comes from the Section 106 National Historic Preservation Act regulations, and basically says the agency has to make a good-faith effort to investigate whether there are unknown archeological resources out there, and the agency clearly did that here by the archeological resources technical report. The Northern Idaho case that has been mentioned is distinguishable because there the agency had just not done any investigation with regard to three of the four phases of that project. Here there was a very thorough one, as the district court pointed out. I don't want to cut into my co-counsel's time. Thank you. Good afternoon, Your Honors. Robert Thornton, on behalf of the city and county of Honolulu, city appellees, let me respond first to the court's question about the status of the state court litigation and its relationship here. So there was a stipulated order entered into as a result of the Hawaii Supreme Court decision that essentially said that the city was obligated to go and complete what's called the archeological inventory surveys under Hawaii law for the entirety of the project before any construction on any portion could proceed. So there's now been a stipulated order entered into it, and the city is going through that process to complete that. Those surveys, those studies have to be effectively approved by the state historic preservation officer, which is the entity both under federal law and state law that essentially governs the adequacy of those determinations. And then there will be a further permit process under state law in order to, once again, commence construction. I'm going to ask a practical question, and I'm not sure how it ties into our appellate jurisdiction, but obviously if everybody in the room thought that nothing was going to happen until the agency finished whatever it was doing on remand, effective review of the district court decision would not be precluded. So I'm trying to figure out, in my own mind, how long it's going to take this Hawaii process to be completed. Well, a little bit of speculation on my part, Your Honor, because the schedule is not entirely within the control of the city, as I indicated. But we are anticipating that this fall we will be through the process under Hawaii law with the state historic preservation officers, concurrence, et cetera, and then subject to obtaining requisite construction permits begin to proceed with construction in the fall. But I want to make one really important point here. The plaintiffs, as Your Honor noted, we filed a motion for limited remand to request to allow the district court to, in a minor way, modify the partial injunction. Plaintiffs could do the same thing. They haven't even appealed the partial injunction, which is one of the reasons why this Court, in our view, does not have jurisdiction under Elsia Valley. They could obviously move for a limited remand if they're unhappy with the partial injunction. I have to make one other point about this. Throughout the course of this litigation over the last three years, they never went into court to seek a preliminary injunction. Indeed, construction started on the project in advance of the Hawaii Supreme Court's decision. Plaintiffs never sought a preliminary injunction. Now, you might ask, why was that? Mr. Yo spoke about, you know, foreclosing alternatives. Because construction is starting on the far west end of the project, basically in the less urbanized portions of the project, the less sensitive areas, areas where there are not 4F issues, areas where there are not historic resource issues, et cetera. Otherwise, I assume when construction commenced a couple years ago in that area, plaintiffs would have gone in for a preliminary injunction, but they did not. When Judge Tashima entered the order that we're here today about, was the Hawaii Supreme Court, and I know it's not an injunction, was the stipulated declaratory relief order in effect? Yes, it was. The Hawaii Supreme Court, make a distinction there, Your Honor, to be accurate. The Hawaii Supreme Court decision had been issued at the time of the decision and the remand order entered by the district court. That's what I was asking. But the subsequent stipulation, which was entered into with the parties in the state court litigation, had not been entered into. I guess I'm asking whether Judge Tashima could have reasonably contemplated when he entered his order that an injunction with respect to Phases I, II, and III in the short run would be duplicative. I believe the answer to that is no, Your Honor. There were certain – there was an evidentiary proceeding that the district court held with regard to the remedy, and both sides presented evidence with regard to the equities. We indicated, I believe at the time, that subject to, obviously, the variabilities of the process that we thought that construction would commence sometime in the fall, the district court considered all of those equities as was appropriate and decided not to enjoin the first three phases of the project, which obviously we thought was entirely appropriate. We frankly supported and endorsed the partial injunction. That had nothing to do with what permits were – had to be sought under State law. I think that's correct, Your Honor, that his determination was solely with regard to the equities in this case and not assuming that there was a de facto injunction in place under State law. That's the information I was looking for. But I think it's really important, because as Judge Schroeder mentioned, either this Court has jurisdiction or not. And in our view, we think it's clear you do not, because you don't have a final decision. Mr. Yost referred to the intent of the district court judge here. Your cases make clear that the intent or statements of the district court judge really don't matter. The question is under 28 U.S.C. 1291 whether this is a final decision. But what we have is a decision with respect to the three phases that is final. And in terms of nothing is happening, nothing left for the Court to do on that, and the injunction, phase 4, has been remanded, and there's an injunction in that which would be appealable, except it hasn't been appealed. Your Honor, that's really not entirely correct, and let me explain why. An aspect of the case which we lost is that the district court ordered the Federal Transit Administration and the city to complete the analysis of so-called traditional cultural properties in phases 1 through 4. Now, at the time of the remedy proceedings in the district court, we did represent to the district court that the completion of those traditional cultural property surveys in phases 1 through 3 was substantially advanced, but not completed. So it's not a correct statement to say that, gee, all the issues in phases 1 through 3 have been resolved. It is correct that the district court decided, applying equitable principles and the standards applicable to injunction, not to enjoin construction in phases 1 through 3. But it's not correct to say that all the substantive issues in the case relate solely to phase 4. Well, let me ask you the question I asked your opponent. When Judge Tshishima said, should the defendants determine upon further examination of the evidence that their previous decision to exclude, and this happens to be the Baratania alternative, and there are two more things that similar language says, because it would be imprudent, they must withdraw the FEIS and R.O.D. and reconsider the project in light of the feasibility of the alternative. I asked your opponent about that, and he said those things apply only to phase 4, and they're not relevant to phases 1 through 3. Is that your view also? That's correct, Your Honor, that the only section 4F issues remaining in this case are section 4F issues with regard to phase 4, the downtown portion of the project. The Chinatown If they have to withdraw the FEIS and the R.O.D., that will only be as to section 4. That's not correct, Your Honor. That would be a decision for the district court as to whether the modifications to the project that might be triggered by that further review would necessitate some broader evaluation of the project. So I don't think it's correct to say that any of us can say with certainty sitting here today that necessarily there wouldn't be an impact. But it is fair to say that the issues about section 4F alternatives that were required by the district court order relate to phase 4. Now, I want to make one really important point in response to Mr. Yost. As this is a voluminous record in this case, and so it's easy to do, but plaintiffs have flatly mischaracterized the record. Mr. Yost started with the characterization that this was a paradigm that there were only three alternatives considered. That's a flat-out misstatement of what occurred in this process with a 10-year process of an elaborate evaluation of a broad range of alternatives. But specifically with regard to 4F, he said that alternatives were not evaluated, alternatives to the project. And I cite the court to excerpts of record 913, which is the beginning of the 4F analysis, 939 and 941 and 953, where the 4F analysis specifically considered alternatives other than the project as potential avoidance alternatives for various 4F resources along the project site, including two tunnels, the so-called King Street Tunnel, the Baratania Tunnel alternative, which the district court has required us to go back and reevaluate, realigning the project along North King Street, changing the alignment of the project on Queen Street. So it's simply not correct as a matter of the record to suggest that there were only three alternatives evaluated. I guess what troubles me, that goes to rooting, does it not? That goes to both rooting and more rooting, yes, but also whether it's grade-separated or whether it's underground, yes, those alternatives. Where it goes, yes. Right. Because I guess just my understanding is that the city had a panel of experts that chose the steel-on-steel technology. That had been done before the EIS was done. The city and panel of experts to look at various technologies, everything from magnetic levitation to rubber-tied vehicles to steel-on-steel, it's not correct to say that they made a decision. It was an advisory body, and ultimately in this matter they made a recommendation. It was a four-to-one determination endorsing steel-wheel-on-steel rail, which is not too surprising because if you look around the country, most rail projects of this type are still using steel-wheel-on-steel rail for a variety of technical reasons. But ultimately that was a decision, a policy decision, that had to be made by the Federal Transit Administration. But we think it is important that there was a panel of experts that looked at all those alternatives and said, this is the alternative we think makes the most sense in terms of technology. I wanted to, unless the Court has other questions for me on the jurisdictional issue, I want to make one, I think, global important point about compliance in this case. Compliance with NEPA, compliance with Federal law. The number one environmental question that most, certainly Honolulu faces, most urban communities face is how to develop a transportation system that reduces reliance on the private automobile, that promotes smart growth land use policies, and that provides an equitable alternative for low-income populations and transit-dependent communities. Plaintiffs have proposed their policy alternative, which frankly is more highways. More highways, toll highways that are usable, principally usable by people who can afford a private automobile and that do not promote smart growth land use policies, do not serve transit-dependent communities. That's their answer. That's their policy proposal. They have advocated that at all administrative forums. They advocated that in the legislative process in Hawaii. Their policy solution was rejected. The solution adopted and endorsed by the City and County of Honolulu, the Federal Transit Administration, every elected body in Honolulu and the State of Hawaii, and now endorsed by the Federal Transit Administration, after a decade-long exhaustive environmental process and robust public debate is this project. So we understand that they don't like the policy determination that's been made. But the role of this Court, of course, is to determine was that determination arbitrary and capricious. And we submit that it was a well-reasoned decision, a well-reasoned policy choice. It complied with the National Environmental Policy Act after an exhaustive review of multiple alternatives, thorough analysis of Section 4F resources. We believe that the district court's decision is a lucid and well-written and well-reasoned decision. And we urge this Court to affirm the district court decision. Thank you. Thank you, Your Honor. Mr. Yost, we're going to give you another five minutes. Thank you, Your Honor. Briefly respond to several points that were made, starting with the last one, that there is a policy difference. We're not here about a policy difference. We're here about whether or not there was compliance with Section 4F and DEPA. Secondly, Mr. Shelton referred to the 2008 regulations as codifying existing law. That most respectfully is not the case. As the agency said in its preamble to those regulations, which we've attached to our principal brief, at page 11368, it says, Courts around the country have applied the Overton Park decision, reaching different conclusions as to how various factors may be considered and what weight may be attached to the factors an agency uses to determine whether an alternative, an avoidance alternative, is or is not feasible and prudent. So this does not codify, but instead really reaffirms what Overton Park had said in the first place. Mr. Shelton also referred to not meeting purpose and need, and we really haven't discussed that. But as you, Judge Schroeder, were accurately stating, there's a whole series of issues discussed in our brief of how the agency in pre-NEPA, non-NEPA context simply dismissed all sorts of alternatives and the Feds just sort of bought into it without complying with NEPA. Kennedy. Is it correct that you have never asked for an injunction on Phases 1, 2, and 3? I mean, we were trying to stop the whole thing. That was the whole purpose of this lawsuit, including our complaint asked for injunction relief on everything. And, you know, unfortunately, Judge Toshima gave us some injunctive relief on as to 4, but didn't ask to do it. You haven't appealed the denial of injunction. Well, I mean, we are appealing, you know, right now the entire thing, which includes a denial of an injunction. I mean, that's what we want. We didn't get it. Appealing a decision on the merits. On the merits, and the merits include our having asked that this be stopped until NEPA and 4-F are complied with. The argument has been made in the briefs, but is not made in the briefs. And I'm just wondering if you're not appealing from the denial of an injunction as to the construction of the project. You're appealing from the decision that the project go forward on the merits. Well, yes, but that is a decision in which our request for injunctive relief is denied. Is denied. Yes. So it could be construed that way. The – in the briefs, there was a lot of talk about the degree to which safety lieu may or may not have affected matters. But it's just really important to keep in mind 139K of safety lieu, which says this does nothing in these new – in this new law, which then resulted in the regulations. Can I go back to the injunction issue for a second? Because I think I understand your practical point. But grants or denials of preliminary injunctions are appealable. You're not here appealing from the denial of a preliminary injunction, are you? Well, we're here appealing, really, the denial of a permanent injunction. Well, but there's not – that only matters if there's a final order, which is the technical point I think we're sort of stumbling over. But I understand your position. Which also gets into the issue which Mr. Thornton raised about why we didn't go in for preliminary injunction before. And, you know, Judge Toshiba said, you know, I'd rather not hear this matter twice. And it was fair enough. And then we had – and this is exchanges which are in the record between Mr. Thornton and myself – considerable correspondence about what could happen in the interim such that our clients were satisfied that during the pendency of what we thought would be the time period until there would be a district court judgment that nothing significant would be happening and that things that did happen, like putting a foundation pole in the ground, could be taken out. In other words, there wasn't – they weren't committed in a way that they would be when construction really got underway, which is what we came to talk about later. I'm sorry. I may be missing something. But Phase 4 has been remanded for further investigation. In the meantime, the city can, if it wants, go ahead and construct Phases 1, 2, and 3. And there's some concern, does that mean it will be too late then, because they're so – but nobody, as I understand it, is appealing to us or asking for an order that they be enjoined from going ahead and constructing Phases 1, 2, and 3. I may be missing something, but I find it odd, if that's a concern, that they'll be so far down the road that it'll be too late to turn back that nobody has said we want an order preventing them from going so far down the road. I suppose we would like such an order, Your Honor. But you have – this is the source of my confusion or concern. What you haven't done is come to us and say we want an order pendente lite. We want an order while this stuff is going through the agency to make sure that the thing doesn't get finished. You've lost on the merits. Well, perhaps you've lost on the merits, but you may have a sliding scale and all those other issues. So without regard to whether we granted it, you're not here simply saying we want this project held up while the agency finishes its stuff and then we'll come up with the whole appeal. You want the appeal to come up now. Well, I mean, we frankly assume, you know, that should you rule, as we think you should, in our favor, that the agency isn't going to be going, you know, flatly in the face of what this Court says and starting to construct. But that wasn't really what I asked. What I asked is, without regard to whether or not we can give you this, what you're not seeking is holding up the project pending the agency determination and then moving ahead with an appeal on the entire matter. We haven't, but we certainly can. Thank you. I asked because somebody's asked for a remand to the district judge. And it strikes me it might be a reasonable thing to ask him, but I leave that to you. I think we're about through, if you'd like one more minute. Well, you know, the partial remand which they have asked for is something which does not automatically stop things under, you know, the circuit rules and is our intention to oppose it. We have 10 days in which to do so, and we will do so during that time. But also in talking about the jurisdictional issue, I just want to re-invite your attention to the Sierra Forest legacy case which we discussed in our brief. And it's really the closest case to this. Partial injunction and remand. Plaintiffs appealed. Agency didn't. Agency put out an SES saying no changes to the project. And this Court said there was jurisdiction under 1291. And so we simply invite your attention back to that case. Thank you. Thank you, Your Honor. Thank you all very much. I think we've learned a lot. I don't know that it brings us any closer to an answer. Thank you for the argument. It was very helpful. The case is submitted. Court will stand in recess for the day.
judges: Schroeder, Reinhardt, Hurwitz